**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

GRACE MCCORD,

Plaintiffs,

v. Case No.: 3:24-cv-956-WWB-PDB

DAL-TILE SERVICES, INC.

Defendant.
_______________________________/

**ORDER**

THIS CAUSE is before the Court on Defendant's Motion for Summary Judgment (Doc. 25), Plaintiff's Response in Opposition (Doc. 27), Defendant's Reply (Doc. 28), and Plaintiff's Sur-Reply (Doc. 32). For the reasons set forth below, the Court will grant Defendant's Motion.

## I. BACKGROUND

From late 2019 to 2023, Plaintiff Grace McCord worked as an Architectural Sales Representative ("**ASR**") for Defendant, Dal-Tile Services ("**Dale-Tile**"). (Doc. 25-2 at 22:12–13, 29:18–21; Doc. 25-18 at 1). As an ASR, Plaintiff's job was to promote Dal-Tile products to architectural and design firms in northern Florida, mainly for use in commercial projects. (Doc. 25-2 at 29:22–30:7; Doc. 25-11 at 97:6–16). Specifically, ASRs flag commercial projects as product sales "opportunities" on a software called "Salesforce." (Doc. 25-2 at 30:2–24; Doc. 25-11 at 93:14–16, 96:11–20). From there, a Commercial Sales Representative works directly with tile contractors to "close" on those opportunities and create sales invoices in a data system called "Oasis." (Doc. 25-11 at 94:20–22, 97:10–98:24). Ultimately, the ASR is involved at all stages of this process and

operates on an "honor system" to accurately track sales updates on the Oasis database and mark projects as complete on Salesforce. (*Id.* at 96:6–99:9).[1] Because an ASR will typically spend between a year and a half to two years completing that sales process, Dal-Tile guaranteed a quarterly incentive (bonus) to new hires in Plaintiff's position. (*Id.* at 43:10–44:12). Dale-Tile expected that ASR employees possess "[s]trong communication skills" and be "[h]ighly [o]rganized" throughout that whole process. (Doc. 25-3 at 3).

After completing her first calendar year of work in 2020, Plaintiff underwent an official performance review by her supervisor, Antonio Sarria, and received an overall rating of 2.25 stars out of four. (*See generally* Doc. 25-5). That rating was characterized as a "Partially Successful Performance/Emerging/Needs Improvement." (*Id.* at 3). Though Sarria gave Plaintiff high marks for staying connected with customers, Sarria noted that Plaintiff needed to improve organization in her work area and "establish a tracking system to support her team and store and build her relationships within her team." (*Id.* at 2–3). Nevertheless, based on that performance review, Plaintiff was awarded a merit pay increase. (Doc. 27-2 at 2).[2]

---

[1] Because ASRs operate on the honor system, Dal-Tile "audits" all ASRs to ensure sales figures are accurately reported and so that ASRs receive commensurate bonuses. (Doc. 25-11 at 90:5–10, 184:3–6, 209:1–16).

[2] Defendant argues that the Court should not consider this evidence for summary judgment purposes because it comes from a declaration, not an affidavit. (Doc. 28 at 2). Where, as here, a declaration is executed in accordance with 28 U.S.C. § 1746, courts treat the declaration as an affidavit. *See United States v. Four Parcel of Real Prop. In Green & Tuscaloosa Cntys.*, 941 F.2d 1428, 1444 n.36 (11th Cir. 1991).

Defendant further argues that the Declaration should not be considered because Plaintiff allegedly gave inconsistent answers as to when she reported gender discrimination to her supervisor Sarria, rendering her Declaration a sham. (Doc. 28 at 2).

However, Plaintiff's performance rating declined to 1.5 stars out of four based on her work during the calendar year of 2021. (Doc. 25-10 at 3). According to Sarria, Plaintiff "struggled to develop a good relationship with her team at the local level," needed to better "service her client's needs directly," "failed to meet team standards in reporting closed won opportunities," and that she "has to work on her organization and her accuracy in salesforce reporting." (*Id.* 1–3). Aside from those performance issues, Plaintiff failed to comply with Dal-Tile's expense reporting policies. In April 2021, Plaintiff purchased seven bagels and a quarter pound of cream cheese and attempted to expense them as a dinner for herself; she also expensed non-reimbursable purchases at Smoothie King and failed to maintain itemized receipts for flower purchases. (Doc. 25-7 at 2). In November 2021, Plaintiff sent a text message to a colleague jokingly stating that she's "already on the expense naughty list even though [she's] used hardly any expenses." (Doc. 25-8 at 2).

At the same time in 2021, Plaintiff states that she faced gender bias from her colleagues. Plaintiff testified that she would be humiliated and "cut off" during calls and video meetings with Rudy Junifer, the Jacksonville Branch Manager, Sean Saglin, a Commercial Sales Representative, and Ray Glover, a General Sales Manager. (Doc. 25-2 at 109:14–25, 125:3–5; Doc. 25-11 at 33:9–34:3; Doc. 27-2 at 2). Saglin and Glover would "heckle" Plaintiff in a demeaning way, which she felt was done because of her

---

Courts must find "some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit" as a sham. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (quoting *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1316 (11th Cir. 2007)). Here, the Court finds no inherently inconsistent or contradictory testimony. While Plaintiff stated clearly in her deposition that she reported alleged discrimination in 2021, she also said in her deposition that she reported discrimination to her supervisor a "couple" of times. (Doc. 25-2 at 108:19–22). Because the Declaration simply clarifies Plaintiff's answer, the Court will consider the Declaration.

gender. (Doc. 27-2 at 2–3). Junifer at one point told Plaintiff "that the tiling industry was a 'Man's World'" in the presence of other male employees. (*Id.* at 3).[3] Plaintiff also believed she observed Junifer treat male colleagues like Glover and Saglin more favorably in the workplace. (*Id.*).

Plaintiff testified that she reported these incidents to Sarria, and that they would cause her to cry. (*Id.*). Plaintiff testified that when she reported her interactions with Junifer to Sarria in August 2021, Sarria encouraged her "to stroke [Junifer's] little man ego and make him feel good and happy" in response. (Doc. 25-2 at 87:12–88:5, 105:1–106:10). Though Sarria testified that Plaintiff would cry while discussing "[p]erformance-related issues" and acknowledged Plaintiff and Junifer "didn't get along," (Doc. 25-11 at 54:3–55:2, 85:8–20), he denies that Plaintiff ever discussed discriminatory remarks by Plaintiff's colleagues and testified that discrimination against Plaintiff would be "morally wrong." (Doc. 25-11 at 61:14–25, 62:25–63:6, 179:2–25, 183:17–184:9, 222:15–18).[4] Taylor Wilkerson, the human resources manager and representative for 300 to 400 Dal-Tile employees, testified that Sarria never reported any alleged harassment of Plaintiff to her. (Doc. 25-23 at 5:1–12, 12:7–13:6, 53:14–54:11).

In early 2022, Dal-Tile performed an audit of Plaintiff's "closed/won" opportunities on the Salesforce software. Plaintiff entered one project called "Bread & Board" on Salesforce with a value of $51,160.24, which could have entitled her to additional compensation. (Doc. 25-11 at 205:18–206:24; Doc. 25-12 at 3). In reality, the completed

---

[3] Junifer denies that he ever made this comment and asserts that he never said anything resembling this remark. (Doc. 25-26 at 3–4).

[4] Sarria also testified that Plaintiff felt Junifer put more pressure on her than others because of Plaintiff's deficient performance as an ASR. (Doc. 25-11 at 185:13–23).

project was valued at $5,160.24. (Doc. 25-12 at 3). In an e-mail addressed to Sarria, Plaintiff explained that this discrepancy was because of "a typo with [the] decimal in [the] wrong place." (*Id.* at 2). But, according to Sarria, this discrepancy caused Dal-Tile to conduct a more comprehensive review of her sales records. (Doc. 25-11 at 209:10–16; Doc. 25-13 at 2). As a result of the audit, Dal-Tile issued an "Employee Discussion Document" to Plaintiff on February 25, 2022, which was designated as a "Written Counseling/Warning" to Plaintiff for "Failure to accurately follow company directives." (Doc. 25-14 at 2). It stated that Plaintiff "failed to record data correctly into Sales Force," "inaccurately recorded customer interactions," "recorded interactions that have not occurred," and "recorded inaccurate closed/won numbers with regards to projects and project dollar amounts." (*Id.*). Plaintiff was warned that failure to correct these performance deficiencies "will result in further disciplinary action up to and including immediate termination." (*Id.*). Plaintiff responded to the warning in a letter, stating that she never intentionally entered inaccurate information into Sales Force and that she received no training on how to properly enter that data. (*Id.* at 4).[5] According to Sarria, Plaintiff was in fact trained on the software, and no other ASR faced the difficulties Plaintiff had with data entry. (Doc. 25-11 at 149:15–24, 151:1–13).

In 2022, Plaintiff also failed to adhere to Defendant's corporate credit card policies. Due to an unpaid $1,334.89 credit balance on her corporate card, Plaintiff was notified on September 8, 2022, that her corporate card was suspended for failure to comply with the Corporate Travel and Expense Policy. (Doc. 25-15 at 3). Plaintiff was also warned that

[5] Plaintiff testified that she was told that this document would not go into her personnel file. (Doc. 25-2 at 142:21–143:2).

her "right to use the Corporate Card" was "in jeopardy" for her failure to keep updated expense reports. (*Id.*). In response, Plaintiff decided to close the card. (*Id.* at 2).

In light of all these performance issues, Plaintiff was placed on a Performance Improvement Plan on February 16, 2023, which was set to be effective for ninety days. (Doc. 25-17 at 2–3). The Plan aimed to help Plaintiff improve her compliance with the company's expense report policies and urged her to improve her communication and responsiveness to colleagues and customers. (*Id.*). The Plan warned, however, that Plaintiff's failure to "sustain performance either during or after" the Plan is completed "will result in disciplinary action and or termination." (*Id.* at 3). Though Plaintiff contended that the "facts used to create" the Plan were "not accurate," she ultimately signed the Plan and stated that she "will comply with the plans objective." (*Id.*).

Around April 14, 2023, Sarria was notified of Dal-Tile's national reduction-in-force. (Doc. 25-11 at 216:24–217:10). Sarria was instructed to eliminate one of the fourteen ASRs under his supervision. (*Id.* at 218:23–25). Ultimately, Sarria selected Plaintiff because she performed "squarely at the bottom" among all ASRs and because her termination would hurt Dal-Tile "the least." (*Id.* at 202:18–203:4, 220:6–14). Approximately sixty positions were eliminated nationally, including three ASRs. (Doc. 25-18 at 8–9). The criteria used to select those individuals included: "seniority, job performance, ability to perform the tasks required of those not laid off, suitability for jobs remaining after the reduction in force, and position elimination." (*Id.* at 8). Plaintiff was subsequently notified of her termination on April 28, 2023. (Doc. 25-18 at 2).[6]

---

[6] In her Response, Plaintiff attaches a deposition of Junifer, wherein he testifies that Defendant replaced Plaintiff approximately one and a half to two years after her termination. (Doc. 27-1 at 42:8–22). Defendant argues the Court should not consider the

As a result of the foregoing, Plaintiff brought this suit against Defendant, alleging that it engaged in gender-based discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e). Plaintiff also raises claims for discrimination and retaliation under the Florida Civil Rights Act. (*See* Doc. 1 at 9–15).

## II. LEGAL STANDARD

Summary judgment is appropriate when the moving party demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it may "affect the outcome of the suit under the governing law." *Id.* "The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Allen v. Bd. of Pub. Educ.*, 495 F.3d 1306, 1313–14 (11th Cir. 2007). Stated differently, the moving party discharges its burden by showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

---

deposition for two reasons. First, Defendant argues the deposition is untimely because it was taken on February 16, 2026, nearly two weeks after the deadline for dispositive motions but before the expiration of the deadline for discovery. (Doc. 17 at 1; Doc. 22). Defendant also argues the deposition is immaterial because Junifer was not Plaintiff's supervisor.

Because of the circumstances described in Plaintiff's sur-reply, (Doc. 32 at 2–4), the Court finds good cause to accept the deposition for summary judgment purposes. Moreover, as explained below, the deposition is relevant to determining what *McDonnell-Douglas* standard should be used to resolve Plaintiff's discrimination claims. Accordingly, in the interests of justice, the Court will consider the deposition.

However, once the moving party has discharged its burden, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (quotation omitted). The nonmoving party may not rely solely on "conclusory allegations without specific supporting facts." *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985). Nevertheless, "[i]f there is a conflict between the parties' allegations or evidence, the [nonmoving] party's evidence is presumed to be true and all reasonable inferences must be drawn in the [nonmoving] party's favor." *Allen*, 495 F.3d at 1314.

## III. DISCUSSION

As an initial matter, Plaintiff's Response states that her Complaint in part "allege[s] an unlawful work environment claim under *Ellerth-Faragher*[7] because [Defendant] took no preventative efforts when it had notice of [Plaintiff's] harassment." (Doc. 27 at 17–18). But Defendant argues that the Court should disregard any theory of a hostile work environment, because Plaintiff's Complaint is limited to claims for discrimination and retaliation under Title VII. (Doc. 28 at 5). "It is well settled that '[a] plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment.'" *Varazo v. Keiser Corp.*, 754 F. App'x 918, 919 (11th Cir. 2018) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). Thus, the Court can decline to address claims that were not properly pleaded at the summary judgment stage. See *Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1247 (11th Cir. 2007).

[7] *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

*Faragher-Ellerth* can create a defense for employers in sexual harassment cases. *See Pasley v. Relogio, LLC*, No. 22-11931, 2023 WL 5844785, at *3–4 (11th Cir. Sept. 11, 2023); *Jones v. Allstate Ins. Co.*, 707 F. App'x 641, 648 (11th Cir. 2017). But, the *Faragher-Ellerth* defense "applies only to employer liability based upon a hostile environment theory" and "has no effect upon employer liability based upon a tangible employment action theory." *Hulsey v. Pride Rests., LLC*, 367 F.3d 1238, 1246 (11th Cir. 2004). Therefore, its applicability rests on whether Plaintiff has adequately pleaded the elements for a claim of a hostile work environment. *McCann v. Tillman*, 526 F.3d 1370, 1378 (11th Cir. 2008).

"As opposed to discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire, a hostile work environment claim addresses acts different in kind whose very nature involves repeated conduct, such as discriminatory intimidation, ridicule and insult. Thus, these claims are based on the cumulative effect of individual acts." *Id.* (quotations and citations omitted). To raise a hostile work environment claim, Plaintiff must plead that "(1) that [s]he belongs to a protected group; (2) that [s]he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability." *Id.* (quoting *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002)); *see also Howard v. City of Robertsdale*, 168 F. App'x 883, 886 (11th Cir. 2006).

After careful review of Plaintiff's Complaint, the Court finds that Plaintiff has not stated a hostile work environment claim for multiple reasons. First, the Complaint asserts factual allegations throughout that closely track the elements of a disparate treatment claim. It alleges that Plaintiff was "highly qualified for her position" based on her sales experience, that she suffered adverse employment actions, including a written warning and placement on a Performance Improvement Plan, which "affected [her] compensation and future employment opportunities with [Defendant]," that Defendant "terminated [her] on account of gender," and that she was treated worse than other "similarly situated" male employees. (Doc. 1, ¶¶ 7, 9, 20, 21, 23, 25). Whether Plaintiff was qualified for her position and whether her employer treated similarly situated male employees more favorably are not germane to a hostile work environment claim. *Compare Stinson v. Pub. Serv. Tel. Co.*, 486 F. App'x 8, 10 (11th Cir. 2012), *with McCann*, 526 F.3d at 1378. Second, the Complaint falls short of alleging that Plaintiff faced severe or pervasive harassment such that it altered the terms of her employment. Only once does Plaintiff allege that she faced "severe" discrimination, (Doc. 1, ¶ 11), and it refers to the discrete acts of her colleagues filing a false "accusation of fraud" culminating in some kind of written disciplinary action. (*Id.*). Nowhere does it allege, for instance, that the terms and conditions of her employment under the Performance Improvement Plan were severe or pervasive. *See Redway v. Univ. of Miami*, No. 17-CV-23326, 2018 WL 10561528, at *5 (S.D. Fla. Sept. 5, 2018), *report & recommendation adopted*, 2018 WL 10758656 (S.D. Fla. Sept. 25, 2018). Rather, the crux of the Complaint centers around the discrete actions of colleagues and the discrete acts of Defendant that disparately affected her

employment. (Doc. 1, ¶¶ 31–33, 37–38). Accordingly, the Court does not find that Plaintiff has raised a hostile work environment claim.

**A. Discrimination**

"Both Title VII and the FRCA prohibit employers from discriminating 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex.'" *Lockett v. Choice Hotels Int'l, Inc.*, 315 F. App'x 862, 865 (11th Cir. 2009) (quoting 42 U.S.C. § 2000e–2(a)(1); Fla. Stat. § 760.10(1)(a)). Courts generally apply Title VII case law to FCRA discrimination claims because the FCRA is patterned after Title VII. *Id.* Thus, the Court will consider both claims together.

When assessing discrimination claims under Title VII at the summary judgment stage, courts use the *McDonnell Douglas*[8] framework. *Reyes v. Fla. A&M U. Bd. of Tr.*, No. 25-10453, 2026 WL 800934, *2 (11th Cir. Mar. 23, 2026) (citing *Ismael v. Roundtree*, 161 F.4th 752, 759 (11th Cir. 2025)). To establish a prima face case of disparate treatment, the plaintiff must demonstrate: "(1) she is a member of a protected class; (2) she was subjected to an adverse employment action; (3) her employer treated similarly situated employees outside of her class more favorably; and (4) she was qualified to do the job." *Stinson*, 486 F. App'x at 10 (citing *McCann*, 526 F.3d at 1373). If a plaintiff shows a prima facie case under *McDonnell Douglas*, the plaintiff is "entitled to a rebuttable presumption of illicit intent." *Thompson v. N. Am. Lighting, Inc.*, No. 3:24-cv-55, 2026 WL 1195044, at *6 (N.D. Ala. May 1, 2026) (quoting *Ismael*, 161 F.4th at 764).

[8] *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973).

Defendant first argues that Plaintiff's discrimination claims fail under *McDonnell Douglas* because she cannot identify any similarly situated comparators.[9] In Response, Plaintiff points to two sets of comparators. First, she points to two other female ASRs with alleged performance issues, Anita Rowe and Leslie Likens. (Doc. 25-11 at 198:5–14). But both of those fail as valid comparators under *McDonnell Douglas* because they are the same gender as Plaintiff. *Meyer v. Sebelius*, No. 12-22666-CIV, 2013 WL 12085986, at *6 (S.D. Fla. Nov. 15, 2013); *see also Chambers v. City of Lakeland*, No. 8:20-cv-2794, 2022 WL 2356816, *8 (M.D. Fla. June 30, 2022) (granting summary judgment in favor of the defendant where the plaintiff failed to show she was treated less favorably than a similarly situated individual outside her protected class).

Next, Plaintiff points to Saglin and Glover as similarly situated male comparators. Defendant argues that there is no evidence that Saglin or Glover shared similar employment history, duties, or compensation structures, and further argues that each had different supervisors. Though Plaintiff acknowledges they have different job titles, she argues they filled roles requiring similar skills and regularly worked alongside Junifer.

Ordinarily, "a similarly situated comparator" will "have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022). Although "[d]ifferences in job rank" may not be "dispositive," *Vinson v. Tedders*, 844 F. App'x 211, 213 (11th Cir. 2021), a comparator must

[9] Defendant appears to argue, in part, that it is impossible for Plaintiff to have a valid comparator because all ASRs at Dal-Tile are women. (Doc. 25 at 2). However, the Court does not find this persuasive. *See Lewis v. City of Union City*, 918 F.3d 1213, 1227(11th Cir. 2019) (holding that it is not "necessary for a plaintiff to prove purely formal similarities—*e.g.*, that she and her comparators had precisely the same title").

nonetheless be "similarly situated in all material respects." *Lewis*, 918 F.3d at 1228–29. It is undisputed that Saglin and Glover do not report to Sarria and that he has no supervisory authority over them like Plaintiff. (Doc. 25-2 at 100:7–15; Doc. 25-11 at 32:2–33:19, 220:25–222:1). Though Plaintiff argues they regularly met together in the performance of their duties, there is no evidence that they shared the same performance metrics as Plaintiff. Even if Saglin and Plaintiff both were involved in sales, the evidence shows that ASRs and commercial sales representatives played distinct roles at Dal-Tile. Finally, there is also no evidence indicating that Saglin or Glover had any similar conduct or disciplinary history, such as Plaintiff's failure to comply with Dal-Tile's expense policies and Salesforce data entry protocols. Accordingly, the Court does not find that the evidence shows a similarly situated comparator outside of Plaintiff's class.

However, where a plaintiff is terminated due to a reduction-in-force, a plaintiff may also show discrimination with respect to their termination by satisfying a modified *McDonnell Douglas* test. Specifically, Plaintiff must produce evidence "(1) showing that [she] was a member of a protected group and was adversely affect[ed] by an employment decision; (2) proving that [she] was qualified for [her] position or to assume another position at the time of the discharge; and (3) producing sufficient evidence from which a rational fact finder could conclude that h[er] employer intended to discriminate against [her] in making the discharge decision." *Lawver v. Hillcrest Hospice, Inc.*, 300 F. App'x 768, 773 (11th Cir. 2008) (quotation omitted); *see also Vega v. Invsco Grp., Ltd.*, No. 6:08-cv-1915-Orl, 2010 WL 11507220, *6 (M.D. Fla. Mar. 15, 2010), *aff'd*, 432 F. App'x 867 (11th Cir. 2011). But Eleventh Circuit precedent makes clear that this modified standard applies only when a party is not replaced by another person outside their

protected class. *See Mazzeo v. Color Resols. Int'l, LLC*, 746 F.3d 1264, 1271–72 (11th Cir. 2014).

Plaintiff, relying on the Eleventh Circuit's decision in *Mazzeo*, argues that the modified test does not apply because her responsibilities were later delegated to another employee after her termination and, therefore, she was not terminated as part of a true reduction-in-workforce. (Doc. 27 at 13). Even in a light most favorable to Plaintiff, the evidence shows the standard test would apply precisely because she was replaced a year and a half after her termination and was replaced by another woman, not someone outside her protected class. (Doc. 27-1 at 42:8–43:4). Therefore, the Court will not apply the modified test.

Finally, even if Plaintiff does not establish a prima facie case under the *McDonnell Douglas* framework, she "will survive summary judgment if she presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Grey v. Vengroff Williams, Inc.,* No. 24-14020, 2026 WL 1165777, at *3 (11th Cir. Apr. 29, 2026) (quotation omitted); *see also Poer v. Jefferson Cnty. Comm'n,* 100 F.4th 1325, 1339–40 (11th Cir. 2024). "Any kind of evidence that raises a triable issue of discriminatory intent is sufficient," which can include "(1) animus against non-comparators in the plaintiff's protected class; (2) whether the employer had a reason to discriminate; (3) suspicious timing, ambiguous statements, and other bits and pieces suggesting discriminatory intent; (4) differential treatment of similarly situated employees; (5) whether the employer's justification is pretextual; and (6) whether the decision was extraordinarily arbitrary." *Grey*, 2026 WL 1165777, at *3 (quotation marks omitted).

Defendant argues that Plaintiff's claims also cannot survive under the convincing-mosaic standard because the evidence shows, at most, that the discrimination she faced amounts to nothing more to stray remarks by non-decision-makers and quarrels with the wisdom of Defendant's business judgment. In Response, Plaintiff argues that the treatment she faced while employed, the nature of the discipline rendered against her, Sarria's failure to address her concerns, and her termination all serve as evidence of discrimination.

The alleged discriminatory remarks made by Plaintiff's colleagues do not support an inference of discrimination because they were not made by "the ultimate decision-maker" who reviewed Plaintiff's performance, placed her on a Performance Improvement Plan, and (eventually) terminated her because of a reduction-in-force. *Poer*, 100 F.4th at 1340. The same is true about any alleged heckling by her colleagues during work meetings, because no evidence suggests it was related to any of the discrete actions Defendant took against Plaintiff. *See id.*; *Jones v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1323 (11th Cir. 1998). Rather, the evidence shows Plaintiff was placed on a Performance Improvement Plan based on the performance deficiencies identified by Defendant, none of which Plaintiff contests with other evidence. Furthermore, although her termination occurred approximately two months after the issuance of the Improvement Plan, Sarria was only made aware of the national reduction-in-force after placing Plaintiff on that plan and was thereafter instructed to terminate one of his fourteen employees. (Doc. 25-11 at 24:16–19, 218:9–25). Sarria testified that Plaintiff performed "squarely at the bottom" among all ASRs, and that her termination would "hurt" the company "the least." (*Id.* at 202:21, 220:12–13, 22-24). Because there is no other

evidence from which a jury could infer intentional discrimination against Plaintiff in any of the discrete actions taken against her, the Court finds that Defendant is entitled to summary judgment as to Counts I and II.

**B. Retaliation**

Title VII prohibits an employer from retaliating against an employee "because [s]he has opposed any practice made an unlawful employment practice by [Title VII], or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "Like discrimination claims, retaliation claims are ordinarily analyzed under the *McDonnell Douglas* burden-shifting framework." *Nevins v. DCH Health Sys.*, No. 25-12124, 2026 WL 1103517, at *4 (11th Cir. Apr. 23, 2026). "To state a claim for retaliation under Title VII, a plaintiff must allege the following elements: (1) she participated in an activity protected by Title VII; (2) she suffered an adverse employment action; and (3) there is a causal connection between the participation in the protected activity and the adverse action." *Arafat v. Sch. Bd. of Broward Cnty.*, 549 F. App'x 872, 874 (11th Cir. 2013) (citing *Pipkins v. City of Temple Terrace,* 267 F.3d 1197, 1201 (11th Cir. 2001)). "If the plaintiff establishes a prima facie case and the employer rebuts it with a nonretaliatory reason, then the court must evaluate whether the record presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional retaliation, an inquiry to which evidence of pretext is relevant." *Nevins*, 2026 WL 1103517, at *4. "If the plaintiff does not establish a prima facie case, then the court proceeds directly to the convincing-mosaic inquiry." *Id.*

Defendant argues that Plaintiff's retaliation claims fail because there is no record evidence showing she engaged in statutorily protected activity and thus no evidence showing a causal connection between an adverse action and any protected activity. In Response, Plaintiff argues that she reported treatment of gender bias by her colleagues to Sarria, that Sarria took no corrective steps to address the treatment, and that she was terminated as a result.

Reporting sex discrimination to a supervisor, whether formally or informally, constitutes protected activity under Title VII. *Wheatfall v. Bd. of Regents of U. Sys. of Ga.*, 9 F. Supp. 3d 1342, 1353 (N.D. Ga. 2014). But the complaint "must satisfy two requirements: (i) it must place the employer on notice that the employee was opposing a practice made unlawful by Title VII, and (ii) [it] must have been based on a good faith belief that [the] employer was engaged in unlawful discrimination." *Banks v. IGov Techs. Inc.*, No. 8:14-cv-2701-T, 2015 WL 12939794, at *11 (M.D. Fla. Oct. 27, 2015) (quotation omitted), *aff'd*, 661 F. App'x 638 (11th Cir. 2016). Here, there is evidence that Plaintiff reported alleged discrimination directly to her supervisor in 2021, 2022, and 2023. (Doc. 25-2 at 89:24–90:15, 93:1–6; Doc. 27-2 at 3–4). Moreover, there is evidence that Sarria told Plaintiff that she needed to set up meetings with Junifer, "stroke his little man ego[,] and make him feel good and happy" in response to her complaints. (Doc. 25-2 at 88:2–3). Although Sarria denies that Plaintiff ever discussed discriminatory remarks made by Plaintiff's colleagues and strongly asserts that discrimination against Plaintiff would be "morally wrong," (Doc. 25-11 at 222:18), it is not the Court's role at the summary judgment stage to weigh evidence and decide which version of events is most compelling. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) ("Credibility

determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." (quotation omitted)). Therefore, the Court finds that this issue is disputed.

As to causation, Plaintiff argues that the time between her complaints to Sarria and her termination is sufficient to create a triable issue. "[W]here temporal proximity is the only evidence of causation, that proximity must be 'very close.'" *Nevins*, 2026 WL 1103517, at *4 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). The Eleventh Circuit has held that "a gap of three months or longer between the two events, without more, is insufficient to infer causation." *Id.* The Court agrees with Defendant that Plaintiff's complaints in 2021 and 2022 are too far removed from Sarria's decision to place her on a Performance Improvement Plan or to terminate her in 2023. Although Plaintiff states that she lodged complaints of gender bias with Sarria in 2023, she does not specify when that occurred precisely.[10] When a party relies solely on temporal proximity, time is of the essence. Thus, Plaintiff has failed to produce sufficient evidence showing a causal connection between her complaints and an adverse action.

Plaintiff also fails to show a convincing mosaic of retaliation. Even construing the alleged comments made by Sarria as true, that Plaintiff should "cover [her] ass" by documenting any alleged discriminatory treatment from her colleagues and "stroke [Junifer's] little man ego," those comments were made sometime in August of 2021. (Doc. 25-2 at 88:2, 110:22; *see also id.* at 105:24–106:10). At most, these comments only seem relevant to one comment made by Sarria in the 2021 Performance Review—that Plaintiff

[10] In her Response, Plaintiff attaches two emails she sent to Sarria in March of 2023. (Doc. 27-7 at 2; Doc. 27-8 at 2). But neither email includes any report or mention of her colleague's alleged discriminatory treatment.

"struggled to develo[p] a good relationship within her team at a local level" and that she "needs to take the next steps in developing their confidence in her." (Doc. 25-10 at 2). But that is nothing more than a "scintilla of evidence" showing her complaints about gender discrimination were connected to a negative performance review. *Ismael*, 161 F.4th at 758 (quotation omitted). Accordingly, because the evidence does not show any causal relation between a protected activity and an adverse action, and Plaintiff has failed to show a convincing mosaic of retaliation, the Court finds that Defendant is entitled to summary judgment as to Counts III and IV of Plaintiff's Complaint.

## IV. CONCLUSION

Therefore, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED**.
2. The Clerk is directed to enter judgment, in favor of Defendant and against Plaintiff, providing that Plaintiff shall take nothing on her claims against Defendant.
3. Thereafter, the Clerk is directed to terminate all pending motions and close this case.

**DONE AND ORDERED** in Jacksonville, Florida on August 7, 2026.

WENDY W. BERGER
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record